UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ANNE MARIE JOHNSON,

    Plaintiff,

v.                                                  Case No:  6:11-cv-1729-Orl-31TBS

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

## REPORT AND RECOMMENDATION[1]

Plaintiff brings this action pursuant to the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for Disability Insurance Benefits and Supplemental Security Income under the Act.

I have reviewed the record, including a transcript of the proceedings before the administrative law judge ("ALJ"), the exhibits, administrative record, and the pleadings and memoranda submitted by the parties.  For the reasons that follow, I respectfully recommend that the Commissioner's final decision in this case be **reversed and remanded** pursuant to sentence four of 42 U.S.C. § 405(g).

## I. Background

Plaintiff was born September 23, 1971.  (Tr. 146).  She has an eighth grade education, (Tr. 195), and past work as a fast food worker, deli cutter, telephone solicitor and landscape laborer.  (Tr. 21).  She reports that when she was three years old, her

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and M.D. FLA. R. 6.02, within fourteen (14) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual findings on appeal.

father slapped her so hard she is half deaf in her right ear. (Tr. 55). She alleges memory problems from her trauma, (Tr. 35), and that she lost her last job because she missed ten to fifteen days per month due to depression. (Tr. 36). She has sickness, mastoiditis,[1] ear infections, herpes breakouts and Bell's Palsy from her HIV. (Tr. 41). She also reports nausea, diarrhea, night sweats and thrush (Tr. 42); she believes has been bipolar for most of her life, (Tr. 43); and her medications cause tremors and pain in her legs and hands and problems sleeping. (Tr. 46). She has shortness of breath requiring two inhalers, (Tr. 46), carpal tunnel syndrome, and arthritis in her pinkie causes pain and difficulty picking things up and lifting herself. (Tr. 47). A muscle presses a nerve in her hand and makes her drop things (Tr. 48); and she claims limitations in her daily activities. (Tr. 51-53). She was in an accident years ago and had to have the car door cut off her hip which now hurts, and her knee pops out. (Tr. 49).

Plaintiff filed applications for a period of disability, Disability Insurance Benefits, and Supplemental Security Income on August 27, 2009. (Tr. 146-73). After those applications were denied, (Tr. 74-80, 90-94), she went to a hearing before an ALJ who decided that she was not disabled. (Tr. 9-22). The Appeals Council denied Plaintiff's appeal on October 6, 2011, (Tr. 1-5); the Commissioner's decision is final and now subject to judicial review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3). Plaintiff was thirty-nine years old at the time of the ALJ's decision on November 30, 2010. (Tr. 22, 186). She alleges she has been unable to work since February 26, 2008, because of chronic

---

[1] Mastoiditis is "an infection of the mastoid bone of the skull. The mastoid is located just behind the outside ear", and symptoms include drainage, ear pain or discomfort, fever, headache, hearing loss, redness and swelling. National Center for Biotechnology Information, U.S. National Library of Medicine, accessed at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002029/.

obstructive pulmonary disorder ("COPD"), AIDS, bipolar disorder, neuropathy, bad eyes, asthma and obesity. (Tr. 190).

Plaintiff treated with Dr. Ahmed at NE Florida Health Services/Deland Medical Center for bilateral ear infection, psoriasis, HIV and asthma in October 2008 and January 2009. (Tr. 265-79). Her CD4 count was low at 244 in October 2008.[2] (Tr. 278). She visited the emergency room three times in October 2008 with complaints of ear pain and itchy patches on her face and ears. (Tr. 286-88). The doctor diagnosed her with psoriasis, HIV, pharyngitis, bilateral otitis externa[3] and bilateral otalgia.[4] (Tr. 286-88).

Plaintiff returned to the emergency room in April 2009 with complaints of pain, bruising and bumps on her right leg resulting from a fall, and she was diagnosed with conjunctivitis and a leg hematoma. (Tr. 289). At the end of April 2009, she was hospitalized for several days due to swelling over her right breast. (Tr. 290-91). At the time, her CD4 Count was 206 and she had a large abscess over her right breast that was drained. (Tr. 290). The doctor noted that she had otitis externa that had healed. (Tr. 290).

Plaintiff was back in the emergency room in June 2009 with complaints of left upper back pain at which time she was diagnosed with muscle spasm, COPD, and HIV. (Tr. 293). At the end of June, she returned to the emergency room and was diagnosed with right breast cellulitis. (Tr. 292).

---

[2] The CD4 count is a measure of the number of CD4 cells or T-cells in the body. A higher number of CD4 cells helps prevent HIV-related complications. A normal CD4 count is between 500-1,000. See Aids.gov, CD4 Count, http://aids.gov/hiv-aids-basics/diagnosed-with-hiv-aids/understand-your-test-results/cd4-count/.

[3] Otitis externa is an ear infection, also known as swimmer's ear. See CDC, Healthy Swimming/Recreational Water,http://www.cdc.gov/healthywater/swimming/rwi/illnesses/swimmers-ear.html.

[4] Otalgia is ear pain. See John S. Turner, Clinical Methods: The History, Physical, and Laboratory (3rd Ed. 1990).

In November 2009, Plaintiff underwent a consultative examination by Dr. Alvan Barber. (Tr. 305-12). She reported being diagnosed with HIV since 1997, AIDS since 2009, herpes since 2009, bipolar disorder since 1990, asthma since childhood, COPD since 2001, and carpal tunnel syndrome since the 1990s, all without recent treatment. (Tr. 305-06). Dr. Barber observed that Plaintiff weighed 287 pounds, she had normal breathing sounds, and a regular heart rate and rhythm. (Tr. 307, 308). He noted no hearing loss, (Tr. 307); observed no clubbing, edema or ulcerations of the upper extremities; and found muscle and grip strength 5/5 bilaterally. (Tr. 308). The examination also showed that Plaintiff had no edema, brawny edema, or ulcerations in her lower extremities. (Tr. 308). But, her sensory examination revealed some numbness and tingling in her knees to toes bilaterally with light touch. (Tr. 308). Plaintiff's fine and gross motor skills were intact and she could walk slowly with a guarded gait, but could not walk on toes or heels or squat. (Tr. 309). Dr. Barber observed that Plaintiff had almost the full range of motion in all of her joints. (Tr. 311-12). He found no evidence of depression and said Plaintiff had a normal affect. (Tr. 309). Dr. Barber diagnosed Plaintiff with HIV and AIDS, bipolar disorder, a history of asthma, decreased vision, history of COPD, history of carpal tunnel syndrome, neuropathy in the lower extremities, tobacco use disorder, and morbid obesity. (Tr. 309). He opined that Plaintiff could walk, stand, and sit for reasonable periods of time, and he said her symptoms may be exacerbated by her excess weight. (Tr. 310).

On December 2, 2009, a non-examining State consultant opined that Plaintiff could do activities consistent with light work, (Tr. 334), but only occasionally climb, balance, stoop, kneel, crouch, or crawl, (Tr. 335), and that she had to avoid concentrated

exposure to fumes, odors, dusts, gases, poor ventilation, and hazards like machinery and heights. (Tr. 337).

In December 2009, Plaintiff underwent a consultative psychological evaluation performed by Malcolm Graham, Ph.D. (Tr. 315-18). During the examination, Plaintiff reported the only time she had seen a mental health professional was in 1999 for depression. (Tr. 316). She also reported attempting suicide four times and an overdose on heart medication. (Id.). Plaintiff told Dr. Graham she went to the library and church, visited friends, watched television and went to the park. (Tr. 317). He observed no depressed or anxious mood and said Plaintiff had no problems in attention or concentration. (Tr. 316). Dr. Graham felt Plaintiff's affect was appropriate, there was no indication of tangential or circumstantial thinking, and she related information in a rational, coherent, and sequential fashion. (Tr. 316). Dr. Graham observed that Plaintiff was oriented and her remote and recent memory was normal with no indications of hallucinations or perceptual disturbances. He diagnosed Plaintiff with depressive disorder, not otherwise specified, probable borderline intellectual functioning, and a Global Assessment of Functioning ("GAF") score of 65-75.[5] (Tr. 317).

Plaintiff went to the emergency room in January 2010 with complaints of bilateral ear pain. At the time, she was diagnosed with bronchitis and otitis media. (Tr. 345). In January and March 2010, state agency psychologists reviewed Plaintiff's medical

---

[5] GAF scores between 71-80 suggest that if symptoms are present, they are transient and expectable reactions to psychosocial stressors and there is no more than a slight impairment in social, occupational, or school functioning. See DSM-IV-TR at 32-34. GAF scores between 61-70 suggest some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, with some meaningful interpersonal relationships. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed. 2000, Text Rev.) (DSM-IV-TR). A GAF score of 50 can represent serious symptoms or any serious impairment in social, occupational, or school functioning. See DSM-IV-TR 32-34.

evidence and opined that she had a non-severe organic mental health disorder and affective disorder. (Tr. 319-32, 354-67). Both psychologists felt Plaintiff had mild limitations in each of the areas of daily living, social functioning, and concentration, persistence, or pace. (Tr. 329, 364).

State agency physician Dr. Mary Seay reviewed Plaintiff's medical records in March 2010. (Tr. 346-353). She felt Plaintiff could perform light work with occasional climbing of stairs and ramps, never climbing ladders, ropes, or scaffolding, and frequently balancing, stooping, kneeling, crouching, and crawling. (Tr. 348). Dr. Seay gave Plaintiff's obesity and neuropathy as the reasons for these limitations. (Tr. 348). She also felt Plaintiff would have no communication limitations, but should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and hazards. (Tr. 350). Later that month, a non-examining State consultant opined that Plaintiff had mild mental limitations. (Tr. 364).

Plaintiff returned to the emergency room twice in April 2010 with complaints of ear pain. (Tr. 425, 429). She underwent a CT scan of her neck that revealed prominence of the pharyngeal mucosa suggestive of pharyngitis/tonsillitis and mildly enlarged cervical lymph nodes. (Tr. 423-24, 426-27). The CT of her sinuses revealed partial opacification of the middle ear cavity bilaterally, left greater than the right and mucosal thickening with mastoid air cells bilaterally. (Tr. 423-24, 426-27). The doctor diagnosed Plaintiff with pharyngitis and left otitis externa. (Tr. 425). She was hospitalized at the end of April 2010 with a left earache and left side facial numbness. (Tr. 413-14). Testing and examination revealed she had a left-side facial palsy secondary to cellulitis affecting the left side, and left otitis media and externa. (Tr. 414). At an emergency room visit in May 2010, a CT scan of Plaintiff's sinuses revealed bilateral mastoid sinus disease,

unchanged on the left and mildly improved on the right; and bilateral middle ear disease, mildly improved on the right and significantly improved on the left.  (Tr. 41).

Plaintiff saw infectious disease doctor Godson Oguchi in June 2010.  (Tr. 370-73). Dr. Oguchi noted Plaintiff had not taken her HIV medication for the past nine months due to a reported problem with her insurance coverage.  (Tr. 372).  Plaintiff reported no nausea, vomiting, fevers, or chills.  (Tr. 372). On examination, Dr. Oguchi observed slight drainage from both of her ears, good air movement in her lungs, and peripheral pulses present in her extremities.  (Tr. 372).  Plaintiff's lab results from June, 2010 documented a CD4 count of 230 and she tested positive for cocaine.  (Tr. 379-82).

Plaintiff followed-up with Dr. Oguchi in August 2010.  (Tr. 375, 392-93).  She underwent another CT scan of her sinuses that showed significant mastoiditis with slight improvement in the left ear and no significant change in the right ear.  (Tr. 376).  Dr. Oguchi reported that Plaintiff's lungs had good air movement and she had no edema in her extremities.  (Tr. 375, 392-93).  Dr. Oguchi diagnosed otitis media, mastoiditis, HIV, herpes, and bipolar disorder.  (Tr. 373).  A June 25, 2010 CT scan revealed mastoid disease.  (Tr. 376).  On August 4, 2010, Dr. Oguchi diagnosed HIV, mastoiditis, otitis media, Bell's Palsy and bipolar disorder.  (Tr. 375).

In June 2010, Plaintiff presented to the emergency room with complaints of depression and suicidal ideation and was admitted to the hospital.  (Tr. 398, 406).  A drug screen was positive for cocaine.  (Tr. 406).  The notes indicate Plaintiff had been off her psychotropic medication for an extended period of time.  (Tr. 399). The psychiatrist observed that she had intact cognition and memory function, she was alert and oriented times three and her insight and judgment were fair.  (Tr. 400).  She was diagnosed with major recurrent depression and a GAF of 30.  (Tr. 400-401).  Plaintiff was noted to have a

"long history of recurrent depression" and an "extensive history of abuse in the past." (Tr. 399). She was discharged after approximately ten days with a GAF score of 50, a diagnosis of major depression, recurrent, and rule out post-traumatic stress disorder. (Tr. 403).

Plaintiff had an initial evaluation with Dr. Adly Thebaud with Family Psychiatric Services in July 2010. (Tr. 386-389). She reported drinking alcohol occasionally and last using cocaine two months earlier. (Tr. 388). Dr. Thebaud noted that Plaintiff had well-articulated speech that was coherent and goal directed. (Tr. 389). He described her mood and affect as dysphoric, anxious, and irritable, but found her train of thought normal and she denied suicidal or homicidal ideations. He noted that Plaintiff's attention and concentration were distractible, but her immediate, recall, and remote memory were good, along with her insight and judgment. (Tr. 389). Dr. Thebaud diagnosed major depressive disorder, rule out bipolar disorder, and a GAF score of 52. (Tr. 389).

Plaintiff followed up with Dr. Thebaud in August 2010 at which time he found she was oriented and alert, her remote and short-term memory was good and her insight and judgment were appropriate. (Tr. 385). In September 2010, Dr. Thebaud noted Plaintiff was doing well with good impulse control and no over anxiety, psychosis or mania. (Tr. 384). The examination showed she had good remote and short-term memory and appropriate insight and judgment with a GAF score of 55. (Tr. 384).

At the administrative hearing in September 2010, Plaintiff testified that she had been homeless for two months and that her three children lived with her grandparents. (Tr. 45). She stated that she weighed 270 pounds and had struggled with weight problems all of her life. (Tr. 37). Plaintiff said she did not receive any treatment from January 2009 through June 2010 and only started taking medications in June 2010 when

she had a severe bipolar attack. (Tr. 39). She testified that she has suffered from bipolar disorder most of her life, but was not on medication. (Tr. 43). At the time of the hearing, she was taking medication which caused side effects of tremors in her legs and hands. (Tr. 46). She also testified that she had trouble hearing out of both ears. (Tr. 49, 55). However, she was able to participate effectively in the hearing, respond appropriately to all of the questions asked by the ALJ and her attorney without asking to have questions repeated. (Tr. 27-59). She also testified that she had problems with concentration and focus, she stopped drinking 2-3 months prior to the hearing and last used cocaine six months before the hearing. (Tr. 56).

A vocational expert ("VE") testified at the hearing. (Tr. 56-66). The VE characterized Plaintiff's past work as a telemarketer as sedentary with a skill rating of three. (Tr. 58). The ALJ asked the VE to consider a hypothetical individual with the same age, education, and work history as Plaintiff, with limitations contained in the ALJ's determination of Plaintiff's residual functional capacity ("RFC"). (Tr. 61-64). The VE testified that such an individual could perform Plaintiff's past relevant work as a telephone solicitor. (Tr. 64).

The ALJ found Plaintiff had the severe impairments of HIV/AIDS, neuropathy of the lower extremities, obesity, COPD, and mastoiditis/otitis medis. (Tr. 14, Finding No. 3). The ALJ also found Plaintiff's mental impairments (including probable borderline intelligence and depression) were not severe. (Tr. 14). The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments at 20 C.F.R. pt. 404, subpt. P, app. 1 (2011). (Tr. 16, Finding No. 4). The ALJ concluded that Plaintiff retained the RFC to perform a range of light work, but she must be able to alternate positions at will from sitting, standing, and

walking; she can never climb ladders, ropes, or scaffolds; she can occasionally climb ramps and stairs; she can frequently balance, stoop, kneel, crouch, and crawl; and she must avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation, and hazards such as machinery and heights.  (Tr. 16-17, Finding No. 5).  With these limitations, the ALJ decided Plaintiff could perform her past relevant work as a telephone solicitor, (Tr. 21, Finding No. 6), and that she had not been under a disability, as defined in the Act, since her alleged onset date of February 26, 2008, through the date of the ALJ's decision. (Tr. 22, Finding No. 7).

Plaintiff filed a timely request for review of the ALJ's decision, which was denied by the Appeals Council on October 6, 2011. (Tr. 7-8).  Accordingly, the ALJ's November 30, 2010 decision is the final decision of the Commissioner.  Plaintiff timely filed this action for judicial review on October 27, 2011, (Doc. 1); she has exhausted all available administrative remedies and her case is properly before this Court.

On appeal, Plaintiff argues that (1) the ALJ did not apply the proper legal standard when considering her mental impairments; (2) the ALJ failed to apply the proper standards when considering her complaints of pain in her ears, face and hands and when considering her obesity; and (3) the ALJ improperly relied on the VE's response to a hypothetical question and RFC that did not include all of her limitations.

## II. The ALJ's Decision

In determining whether an individual is disabled, the ALJ must follow the five step sequential evaluation process established by the Social Security Administration and set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).  Using this process, the ALJ must determine whether Plaintiff (1) is currently employed; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or medically equals an

impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform past relevant work; and (5) retains the ability to perform any work in the national economy. See Phillips v. Barnhart, 357 F.3d 1232, 1237-1240 (11th Cir. 2004).  Plaintiff bears the burden of persuasion through step four and at step five the burden shifts to the Commissioner. Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); Phillips, 357 F.3d at 1241 n.10.

Here, the ALJ performed the required five-step sequential analysis.  At step one the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her February 26, 2008 alleged onset date. (Tr. 14).  At step two, the ALJ found Plaintiff has the following severe impairments: HIV/AIDS, neuropathy of lower extremities, obesity, asthma/COPD, and mastoiditis/otitis media as defined in 20 C.F.R. §§ 404.1520(c) and 416.920(c). (Id.)  At step three, the ALJ decided Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. §§ 404.1525, 404.1526, 416.925, and 416.926. (Id.).  At step four, the ALJ determined that Plaintiff is capable of performing past relevant work as a telephone solicitor. (Tr. 21).  Accordingly, the ALJ concluded without reaching step five that Plaintiff was not under a disability within the meaning of the Social Security Act from February 26 2008, the alleged disability onset date, through November 30, 2010, the date of the ALJ's decision.  (Tr. 22).

### III.  Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether the ALJ's findings are supported by substantial evidence. Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42

U.S.C. § 405(g). Substantial evidence is "more than a scintilla but less than a preponderance. It is such relevant evidence that a reasonable person would accept as adequate to support a conclusion." Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178 (11th Cir. 2011) (citation omitted).

When the Commissioner's decision is supported by substantial evidence the district court will affirm even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer concludes that the preponderance of the evidence is against the Commissioner's decision. Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996). The district court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]" Id. "The district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." Foote, 67 F.3d 1533, 1560 (11th Cir. 1995) (per curiam); accord Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (the court must scrutinize the entire record to determine the reasonableness of the factual findings).

### IV. Discussion

Plaintiff argues that the ALJ's determination of her RFC is not supported by substantial record evidence because the ALJ failed to properly consider her mental impairments; failed to consider her severe impairments of mastoiditis/otitis media and obesity; and failed to consider her carpal tunnel syndrome and arthritis.

### A. Plaintiff's Ear Impairments

The ALJ found Plaintiff has mastoiditis/otitis media and that it is a severe impairment that causes more than a minimal limitation on her ability to work. (Tr. 14). However, the ALJ did not include any ear limitations in his hypothetical question to the VE, and the ALJ concluded that Plaintiff could perform her prior work as a telephone

solicitor. (Tr. 21). The Commissioner argues that the ALJ did not commit error because the evidence shows that despite this severe impairment, Plaintiff can hear out of both ears, she was able to actively participate in the hearing, and she previously performed the job of telephone solicitor. In Phillips v. Barnhart, 357 F.3d 1232, 1239-40 (11th Cir. 2004), the Eleventh Circuit held that "for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." When the administrative law judge's hypothetical question does not account for all of a claimant's impairments, the vocational expert's response is not substantial evidence "and cannot support the ALJ's conclusion . . ." Winschel v. Comm'r of Soc. Sec., 631 F.3d at 1181. The Commissioner's argument does not explain or excuse the ALJ's failure to include Plaintiff's severe ear impairment in the ALJ's hypothetical question to the VE. Accordingly, I respectfully recommend the ALJ's decision be reversed and remanded for further proceedings.

### B. Plaintiff's Hand Impairments

Plaintiff argues that the ALJ should have found her carpal tunnel syndrome caused severe impairments to her hands. (Doc. 20 at 10-11). She testified that for the past six years she has had carpal tunnel syndrome and arthritis in her right pinkie finger that causes such pain and cramping that sometimes she cannot lift things, including herself off of a toilet or a bed. (Tr. 47). In support of her argument, Plaintiff relies in part on Dr. Barber's evaluation, where he noted that she had zero reflexes in her upper extremities. (Tr. 308). While Plaintiff told Dr. Barber and Dr. Graham about her history of carpal tunnel, there is no objective evidence that either doctor, or any other doctor, diagnosed her with the condition or prescribed any treatment for her. Nor is it evident from the record that Plaintiff complained of the severity of the pain caused by her carpal tunnel to

the extent she testified at the hearing. The record also shows Plaintiff allegedly suffered from carpal tunnel syndrome well before her claimed onset date, and that this impairment did not prevent her from working. (Tr. 20). This information is readily ascertainable from the ALJ's opinion, and constitutes substantial evidence to support the ALJ's conclusion. Therefore, I respectfully recommend that the Court reject this argument by Plaintiff.

### C. Plaintiff's Obesity

Plaintiff complains that the ALJ did not explain what limitations are caused by her obesity or how the ALJ reached any conclusions about her limitations. (Doc. 20 at 11-12). Plaintiff also argues that the ALJ did not state what limitations he included in her RFC based upon her obesity. She also claims that the ALJ failed to properly follow SSR 02-1p because he did not consider the effect of her obesity on her ability to perform routine movements and necessary physical activity within the work environment. See SSR 02-1p.[2] The ALJ found that Plaintiff could only sit for 15-20 minutes at a time, stand for 15-20 minutes at a time, and walk for 5-10 minutes at a time. (Tr. 16, 18). These findings address Plaintiff's obesity. Notably, Plaintiff does not identify any medical evidence showing that she has any greater limitations than those provided for in the RFC the ALJ assigned to her. While she argues that the ALJ should have stated in his decision whether obesity prevents her performance of her past relevant work, the ALJ implicitly made this finding when the ALJ concluded that she could still perform her prior job as a telephone solicitor. Accordingly, I recommend the Court reject this argument by Plaintiff.

---

[2] Policy Interpretation Ruling; Titles II and XVI: Evaluation of Obesity

### D. Plaintiff's Mental Impairments

The ALJ noted that Plaintiff has been diagnosed with borderline intelligence and depression and determined that she has a non-severe organic mental disorder and affective disorder, with only mild limitations in her activities of daily living, social functioning, concentration, persistence, and pace. (Tr. 16). Plaintiff maintains that in arriving at this conclusion, the ALJ improperly relied on the opinions of non-examining state agency psychologists and improperly based his ruling on the fact that Plaintiff was non-compliant with her medicine, when in fact, Plaintiff could not afford her medicine. (Doc. 20 at 12-13).

From June 2010 until September 2010, Plaintiff was examined by Dr. Thebaud and physicians from Florida Hospital Deland (Tr. 13F, 15F). The doctors who saw her rated her GAF at scores ranging from 30-55. (Tr. 384, 389, 401, 403). The ALJ discounted the opinions of these examining physicians because Plaintiff had not taken her psychotropic medications for an extended period at the time of these examinations. (Tr. 16). Instead, the ALJ relied on an evaluation by Dr. Graham, who examined Plaintiff once on behalf of the Social Security Administration, and the opinions of two non-examining state psychologists. (Tr. 4F, 5F, 9F). Dr. Graham diagnosed Plaintiff with depressive disorder and probable borderline intellectual functioning. (Tr. 317). He opined that her GAF range was 65-75, and the non-examining state psychologists agreed with him. (Id., Tr. 331, 366). The ALJ said he accepted the opinions of the non-examining state psychologists because they were "consistent with GAF scores indicating mild limitations in functioning with treatment." (Doc. 15-2 at 17).

In this case, the ALJ applied an inconsistent rationale. He discounted the opinions of Dr. Thebaud and the physicians at Florida Hospital Deland because when they saw

- 15 -

Plaintiff, she had not taken her medications for an extended period of time. However, the same was true when Dr. Graham examined Plaintiff. (Tr. 314). As a one time, consultative physician, Dr. Graham's report "does not constitute 'substantial evidence' upon the record as a whole. . . ." Santillo v. Comm'r of Soc. Sec., No. 2:10-cv-70-FtM-29SPC, 2010 WL 5697342 *13 (M.D. Fla. Dec. 28, 2010) (quoting Kent v. Sullivan, 788 F. Supp. 541, 544 (N.D. Ala. 1992)). The reports of Dr. Thebaud and the medical records from Florida Hospital DeLand come from examining physicians. While they only treated Plaintiff over a short period of time and thus probably do not qualify as "treating physicians," their opinions should be entitled to the same, if not more, weight than Dr. Graham's. See Patterson v. Chater, 983 F. Supp. 1410, 1415 (M.D. Fla. 1997).

The opinions of the non-examining reviewing consultants upon whom the ALJ relied are entitled to little weight and taken alone, do not constitute substantial evidence to support the ALJ's decision. Swindle v. Sullivan, 914 F.2d 222, 226 n.3 (11th Cir. 1990) (finding that the opinion of a non-examining reviewing physician is entitled to little weight). Additionally, the state agency non-examining consultants examined medical evidence in January and March of 2010. Consequently, they did not have an opportunity to examine Plaintiff's hospital and treatment records from June to September 2010, and thus, the evidence before them was incomplete.

For these reasons, I conclude that the ALJ improperly relied on the report of a one-time examining consultant and the non-examining state agency psychologists without adequately discrediting the reports of Dr. Thebaud and the physicians at Florida Hospital DeLand, all of whom saw Plaintiff more than once. (See Tr. 13F, 15F).

A claimant's refusal to follow prescribed medical treatment without good reason precludes a finding of disability. 20 C.F.R. § 416.930(b). However, a claimant who

cannot afford treatment is excused from the limitations provided by § 416.930(b). Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988). Before the administrative law judge can deny benefits on this basis, he must find that if the claimant had followed the prescribed treatment the claimant would have retained the ability to work. (Id.) Here, the ALJ noted that Plaintiff did not seek treatment from a mental health professional until July of 2010 and that before then she was non-compliant with her psychotropic medication. (Tr. 15). He also pointed to records showing that when Plaintiff began taking her medication, her symptoms improved. (Tr. 16). In formulating Plaintiff's RFC, the ALJ discredited her testimony based upon the significant periods of time when she did not take her medication. (Tr. 20). But, Plaintiff's uncontroverted testimony is that she did not have access to medication from January 2009 until June 2010 because she lacked insurance. (Tr. 40). The ALJ acknowledged Plaintiff's unrebutted testimony that she was not insured and thus, lacked the resources to pay for her medication. (Tr. 15, 17, 18, 19-20). The record shows that on several occasions, Plaintiff explained to her doctors that she was not taking medicine because she had no insurance. (Tr.305, 372, 405). Also, Plaintiff told her doctors and she testified at the administrative hearing that she was homeless. (Tr. 33, 315, 331, 366, 384). Indeed, nothing in the evidence suggests that Plaintiff could afford her medication.

The ALJ's primary reason for finding Plaintiff's mental impairments were mild is that he discounted her treatment records from June to September of 2010 based upon her non-compliance with her medical treatment. In doing so, the ALJ failed to consider that Plaintiff may not have taken her medication because she could not afford it. Because we do not know whether the ALJ would have found Plaintiff non-compliant despite her

- 17 -

lack of financial resources, I recommend the Court reverse and remand this case to the Commissioner for further findings.

### E. ALJ's Hypothetical Question

For a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which reflects Plaintiff's impairments and includes those limitations supported by the record. See <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1227 (11th Cir. 2002) (per curiam); <u>Jones v. Apfel</u>, 190 F.3d 1224, 1229 (11th Cir. 1999.). Because the ALJ omitted Plaintiff's severe ear impairment from his RFC and hypothetical question to the VE, I agree with Plaintiff that the ALJ's reliance on the VE was improper. Accordingly, I respectfully recommend that this case be remanded back to the Commissioner for further consideration.

## V. Recommendation

For the foregoing reasons, I **respectfully recommend** that pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's final decision in this case be **reversed** and **remanded** for further proceedings.

**RESPECTFULLY RECOMMENDED** in Orlando, Florida on the 18th day of January, 2013.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

    Presiding United States District Judge
    Counsel of Record